2025 PA Super 167

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDRE RANDOLPH JR. | : | |
| | : | |
| Appellant | : | No. 487 WDA 2024 |

Appeal from the Judgment of Sentence Entered November 7, 2023
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0005559-2022

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

OPINION BY BOWES, J.:                          **FILED: JULY 31, 2025**

Andre Randolph Jr. appeals from the aggregate sentence of four to eight years in prison arising from his convictions for persons not to possess a firearm and carrying a firearm without a license.  We affirm.

By way of background, on March 11, 2022, Appellant was observed in possession of a handgun in a bar located in Munhall, Pennsylvania.  After investigation, the Commonwealth charged Appellant with the above offenses.  Appellant was prohibited from possessing firearms due to his prior convictions in 2005 of two counts of possession with intent to deliver ("PWID") controlled substances.

Notably, prior to the trial on the above firearms offenses, Appellant filed a motion to dismiss the persons not to possess charge, asserting that the applicable criminal statute, 18 Pa.C.S. § 6105(a)(1), was unconstitutional insofar as it violated his right to bear arms pursuant to the Second Amendment

of the United States Constitution. Following a hearing wherein the Commonwealth provided oral argument and Appellant's counsel rested upon the motion, the trial court denied the motion.

The case proceeded to a jury trial, at the conclusion of which Appellant was convicted of all offenses. The trial court later sentenced Appellant as indicated hereinabove. He timely filed a post-sentence motion and a supplement, which was denied by operation of law after more than 120 days elapsed without a decision.

This timely appeal followed. The trial court ordered Appellant to file a statement of errors complained of on appeal,[1] and Appellant timely complied following the grant of an extension of time. The court authored a responsive Rule 1925(a) opinion. Appellant presents two issues for our review:

> I.    Whether the trial court erred in denying [Appellant's] motion to dismiss count one – persons not to possess firearms because [§] 6105(a)(1), as applied to [Appellant], violated his rights under the Second Amendment and the Fourteenth Amendment of the United States Constitution?
>
> II.   Whether the trial court erred in denying [Appellant's] motion to dismiss count one – persons not to possess firearms because [§] 6105(a)(1) is facially unconstitutional under the Second Amendment and Fourteenth Amendment of the United States Constitution?

---

[1] We remind the trial court that it is required to include in its Rule 1925 order "the address to which the appellant can mail the Statement." Pa.R.A.P. 1925(b)(3)(iii).

Appellant's brief at 5 (some capitalization altered). In addition to the merits brief supplied by the Allegheny County District Attorney's Office, we have received an *amicus curiae* brief from the Pennsylvania Office of the Attorney General ("OAG").

We begin our review with the pertinent legal tenets. The constitutionality of a criminal statute "is a question of law for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Farmer***, 329 A.3d 449, 451 (Pa.Super. 2024) (citation omitted), *appeal granted*, 44 MAL 2025, 2025 WL 1873446 (Pa. July 8, 2025). Further, in both facial and as-applied challenges, Appellant bears a heavy burden to demonstrate that the law "clearly, palpably, and plainly violates the constitution." ***Id***. at 455 n.5 (citation omitted). The Supreme Court of the United States has also stated that "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." ***United States v. Rahimi***, 602 U.S. 680, 701 (2024).

Our Crimes Code defines the crime in question as follows:

(1) A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S. § 6105(a)(1). Appellant's prohibition arises from subsection (c), which forbids firearm possession by "[a] person who has been convicted of an offense under . . . The Controlled Substance, Drug, Device and Cosmetic Act,

- 3 -

or any equivalent Federal statute or equivalent statute of any other state, that may be punishable by a term of imprisonment exceeding two years." 18 Pa.C.S. § 6105(c)(2). The parties do not dispute that Appellant's former PWID convictions rendered him subject to the statutory prohibition on possession of firearms in accordance with the statute.

Appellant's argument on appeal is premised upon § 6105's purported transgression of the Second Amendment of the United States Constitution, which states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Before addressing the arguments of the parties, we examine the binding case law invoked by Appellant's claims. In particular, the Supreme Court of the United States has considered several constitutional challenges implicating the Second Amendment. In **District of Columbia v. Heller**, 554 U.S. 570 (2008), the High Court struck down a Washington D.C. law that prohibited individuals from keeping firearms in their homes unless they were licensed to do so and additionally required that the firearms be stored in a locked and inoperable state. The Court found the restriction to be akin to a total ban on handgun possession in the home, amounting to a "prohibition on an entire class of arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. **Id**. at 628. Importantly, in explaining its rationale, the Supreme Court expounded:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, **nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons** and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626-27 (internal citations omitted, emphasis added).

Two years later, in ***McDonald v. City of Chicago***, 561 U.S. 742 (2010), the Court recognized that the right to bear arms is incorporated by the Fourteenth Amendment and, thus, applies to the states. Significant for our purposes, a plurality reiterated that ***McDonald*** and ***Heller*** did **not** affect the law prohibiting criminals from possessing firearms:

> We made it clear in ***Heller*** that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.

***McDonald***, 561 U.S. at 786 (internal citations omitted).

Twelve years thereafter, in ***New York State Rifle & Pistol Assoc. v. Bruen***, 597 U.S. 1 (2022), the High Court ruled unconstitutional a New York law prohibiting persons from carrying handguns for self-defense unless they

demonstrated a special need for self-protection distinguishable from that of the general community. In so doing, the Court held that means-end scrutiny, such as strict or intermediate scrutiny, does not apply in the context of analyzing Second Amendment constitutional challenges. Instead, the Court articulated the following two-part test that controls our current review:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citation omitted).

Expounding on the first prong, the Supreme Court found that the petitioners in that case were "two ordinary, law-abiding, adult citizens" whose proposed course of conduct, concealing handguns in public, was presumptively protected by the Second Amendment. *Id*. at 31-23. The Court then provided additional guidance concerning the second part of the analysis, concerning the tradition of regulating firearms:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence

that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id*. at 26.

Nevertheless, the Court warned that "[t]o be clear, analogical reasoning under the Second Amendment is neither a regulatory [straitjacket] nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 30. "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

The final Supreme Court precedent we examine is *Rahimi*. There, the Court upheld the defendant's conviction of the federal crime of possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8). The Court additionally clarified and reinforced its application of the test articulated in *Bruen*, specifically the second prong:

> A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "applying faithfully the balance struck by the founding generation to modern circumstances." Discerning and developing the law in this way is "a commonplace task for any lawyer or judge."

**Why and how the regulation burdens the right are central to this inquiry**. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Rahimi*, 602 U.S. at 692 (cleaned up, emphasis added). Notably, the Court concluded that "[**a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment**." *Id*. at 702 (emphasis added).

However, the Court also provided the following word of caution:

[I]n holding that [18 U.S.C. §] 922(g)(8) is constitutional as applied to *Rahimi*, we reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." "Responsible" is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Id*. at 701-02 (cleaned up).

Since *Rahimi*, this Court has addressed constitutional challenges to § 6105 arising in a variety of contexts. In *Commonwealth v. Jenkins*, 328 A.3d 1076 (Pa.Super. 2024), *appeal granted*, 18 MAL 2025, 2025 WL 1874050

(Pa. July 8, 2025), Jenkins attacked the constitutionality of that statute when his underlying prohibition stemmed from his being a fugitive from justice. He argued that "the Commonwealth failed to meet its burden to demonstrate that the statute is consistent with this nation's historical tradition of firearm regulation." *Id*. at 1088 (citation omitted). In affirming, we recounted the applicable law from **Bruen** and **Rahimi**. This Court did not make an express determination as to whether Jenkins fell within "the people" identified in the Second Amendment, instead going to the second part of the **Bruen** test, stating that Jenkins was similarly situated to the defendant in **Rahimi**. *Id*. at 1088 ("Pursuant to **Rahimi**, we must determine if the disarmament of fugitives under [§] 6105 is consistent with principles that underpin our tradition of firearm regulations.").

The **Jenkins** panel then examined historic surety laws and laws disarming vagrants to find that § 6105's prohibition is analogous to those:

> When the Supreme Court issued its June 2024 opinion in **Rahimi**, it emphasized that the key consideration is whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. The lengthy historical analysis above reveals that disarming people similarly situated to [Jenkins] is not only part of this nation's history of firearm regulation, but also of Pennsylvania's history.

*Id*. at 1096 (citation omitted).

In **Farmer**, a case decided several weeks after **Jenkins**, the appellant presented an attack to § 6105 when his prior conviction prohibiting him from possessing a firearm was for felony robbery. We affirmed in an analysis that

began by recounting a brief history of some of the federal cases discussed above, including **Heller**, **Bruen**, and **Rahimi**. The panel first concluded that Farmer fell within "the people" identified in the Second Amendment, and thus the first part of the **Bruen** test was satisfied. **Farmer**, 329 A.3d at 455. However, we found that Farmer's challenge did not survive examination of the second component, concerning whether the regulation is consistent with the Nation's historical tradition of firearm regulation:

> The Supreme Court's **Rahimi** opinion, particularly its "how" and "why" analysis with regard to "going armed" laws, provides an avenue for upholding felon firearms bans such as that of § 6105, at least temporarily. The common law "going armed" laws prohibited the use of dangerous weapons to terrify people and imposed forfeiture of weaponry as a punishment. Plainly, the experience of being robbed at gunpoint and/or the threat of being robbed at gunpoint by one convicted of having done so in the past is sufficient to cause terror. And § 6105 is strikingly similar to [18 U.S.C.] § 922(g)(8), at issue in **Rahimi**, in both how—prohibition of firearm possession—and why—Appellant, based on his criminal history, poses a threat of violence—it restricts Appellant's Second Amendment right. And this case, as distinct from both **Rahimi** and [**Range v. Attorney General**, 69 F.4th 96 (3d Cir. 2023) ("**Range I**")], involves a criminal conviction for a felony that involved the use of a firearm. Given the United States Supreme Court's treatment of the "going armed" laws in its **Rahimi** opinion, we can safely conclude that our nation does indeed have a history and tradition of disarming people like Appellant.

**Id**. at 458 (cleaned up). Accordingly, we rejected Farmer's as-applied challenge to § 6105.

Finally, we recently revisited the matter of whether a felon is entitled to protection pursuant to the Second Amendment in **Commonwealth v. McIntyre**, 333 A.3d 417 (Pa.Super. 2025). In that case, this Court rejected

- 10 -

McIntyre's facial challenge to § 6105 after finding that his as-applied challenge was waived for failure to raise it in the trial court. *Id*. at 430-31. McIntyre had previously been convicted of burglary, robbery, and aggravated assault. In contravention to *Farmer*, the panel held that McIntyre did **not** satisfy the first part of the *Bruen* test by establishing that he is one of "the people" covered by the Second Amendment, explaining as follows:

> Based on all the above, we agree that *Bruen* does not stand for the principle that convicted violent offenders such as McIntyre are "the people" who have a right to possess arms under the Second Amendment. *Bruen* in no way said that felons are protected under the Second Amendment, nor can its decision, with its hyper focus on "law-abiding" citizens, be read as providing the necessary support for such a determination.
>
> Instead, *Bruen* reinforced *Heller*, which unequivocally stated that its holding that individuals had a right to bear arms under the Second Amendment did not in any way call into doubt the government's ability to prohibit felons from possessing firearms. Therefore, under *Heller*, we find that the plain text of the Second Amendment does not cover McIntyre and his possession of a firearm as a convicted offender. This conclusion negates any need to examine *Bruen*'s second question, *i.e.* whether [§] 6105's prohibition against convicted felons and certain other convicted offenders from possessing firearms is consistent with this Nation's history of firearm regulation.

*Id*. at 430 (cleaned up).[2]

**As-applied Constitutional Challenge**

With this background in mind, we first consider Appellant's as-applied constitutional challenge of § 6105. We have recounted that, in such a

---

[2] Notably, **McIntyre** was not an *en banc* decision of this Court.

challenge, "the court determines whether a law with some permissible applications is unconstitutional as applied to Appellant's actions in this case." *Farmer*, 329 A.3d at 451 (citations omitted).

### A. *Bruen* Step One

Pursuant to *Bruen*, the first step of the analysis is to consider whether the plain text of the Second Amendment covers the individual's conduct. *See Bruen*, 597 U.S. at 24. In this case, this presents a question as to whether Appellant is one of "the people" protected thereby. Appellant provides a substantial argument as to this issue in his brief and reply brief, ultimately relying on *Farmer* for the proposition that he is shielded by the Second Amendment. *See* Appellant's brief at 19-27; Appellant's reply brief at 1-4. The Commonwealth does not contest this point in light of this Court's decision in *Farmer*, though it contends that *Farmer* was wrongly decided.[3] *See* Commonwealth's brief at 12-13.

Notwithstanding the apparent contradiction between *Farmer* and *McIntyre*, we conclude that Appellant has satisfied the first component of the *Bruen* test.[4] As noted above, the *Farmer* Court held that, in the context of

_____

[3] The parties submitted their briefs to this Court prior to the *McIntyre* decision. None has sought leave to provide additional briefing concerning that case.

[4] With respect to *McIntyre*, which held that felons are **not** the law-abiding people discussed by the U.S. Supreme Court, we find that we are bound by
*(Footnote Continued Next Page)*

an as-applied challenge to § 6105, "the people" encompasses all Americans, even criminals. *See Farmer*, 329 A.3d at 455. The Court's rationale applies equally to Appellant's as-applied contest herein, despite his being convicted of a different underlying felony.

Hence, while we are generally bound by both cases, we must follow *Farmer*'s conclusion as to the first step of *Bruen*, as it was decided earlier in time and because the *McIntyre* panel was unable to overrule that portion of the decision. We therefore agree with Appellant that he is one of "the people" protected by the Second Amendment, despite having prior felony convictions.

## A. *Bruen* Step Two

The second component of *Bruen* requires that the government "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Appellant contends that the Commonwealth failed at the underlying hearing to meet its burden of

_____

its holding only to the extent it does not contradict *Farmer*. This is because the *McIntyre* panel lacked the ability to overturn an earlier precedent from this Court. *See*, *e.g.*, *Halpern v. Ricoh U.S.A., Inc.*, 299 A.3d 1023, 1029 n.5 (Pa.Super. 2023) ("[I]t is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court, except in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court." (citation omitted)). While on its surface it seems that *McIntyre* may be distinguished from *Farmer* since it involved only a facial constitutional challenge to § 6105, contrasted with Farmer's as-applied attack, this difference appears to lack constitutional significance. Stated another way, the cases are factually and procedurally distinct, but not in a manner material to the *Bruen* analysis.

- 13 -

showing that people convicted of non-violent offenses, like PWID, were historically subject to firearm prohibitions. *See* Appellant's brief at 31. He specifically cites many of the cases discussed above, relying primarily on a non-binding Third Circuit decision in *Range I*, in which the Court of Appeals for the Third Circuit found that the federal counterpart to § 6105 was unconstitutional insofar as it prohibited a person from possessing a firearm based upon a prior misdemeanor food stamp fraud conviction.[5]

Appellant further cites authority for the proposition that his underlying prohibiting offense is not one of "violence." *Id*. at 30-33. For example, he highlights that the United States Sentencing Guidelines and Armed Career Criminal Act both define "crime of violence" and neither entails PWID. *Id*. at 33-35. He also argues that, while felons were traditionally subject to death and forfeiture of property in Colonial America, as the Commonwealth contended at the hearing, the category of "felons" was much narrower than today and would not have included a crime like PWID. *Id*. at 35-36. Appellant additionally maintains that seizure of property in that era was somewhat different than the total firearm possession ban imposed by § 6105 when, for

_____

[5] *Range I* was remanded by the U.S. Supreme Court for reconsideration in light of *Rahimi*. On remand, the Third Circuit again found the statute unconstitutional as applied to Range, noting that his offense of lying to obtain food stamps was not one where he "pose[d] a clear threat of physical violence to another." *Range v. Attorney General United States*, 124 F.4th 218, 230 (3d Cir. 2024) ("*Range II*"). *Range II* was rendered after Appellant submitted his brief to this Court, and he has not filed any supplemental brief discussing this more recent decision.

- 14 -

instance, the government only confiscated weapons used in the commission of an offense. *Id*. at 36. He concludes that the nation's founders could have included a broad statutory scheme to prohibit drug traffickers from possessing firearms, but it did not do so. *Id*. at 41. Therefore, he avers that the Commonwealth cannot demonstrate an adequate historical tradition of regulating persons in his situation.

In its Rule 1925(a) opinion, the trial court first noted that at the hearing on Appellant's motion, counsel rested on the motion itself, which largely cited *Bruen* and the now-vacated *Range I*. *See* Trial Court Opinion, 8/5/24, at 5-6. It further reiterated the proposition from *Rahimi* that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id*. at 8. The court explicitly rejected Appellant's position that firearms regulations are limited to those who committed "crimes of violence," instead focusing on language from the courts that prohibit felons more generally from possessing firearms. *Id*. It concluded that, concerning Appellant's PWID conviction, it was "unwilling to find that this criminal conduct does not pose a threat to public safety, such that our government has no right to regulate firearm possession against this class of felon." *Id*. at 9.

The Commonwealth, in its brief, devotes the majority of its argument to discussing the factually-similar but non-binding case of *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024), contending that § 6105 "is

consistent with this nation's historical tradition of firearm regulation." ***See*** Commonwealth's brief at 23. In that case, the Eighth Circuit rejected a defendant's challenge to 18 U.S.C. § 922(g) premised upon a prior drug conviction, stating:

> [W]e conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson. The district court properly denied the motion to dismiss the indictment.

***Jackson***, 110 F.4th at 1129. In light of this language, the Commonwealth posits: "The fact that [A]ppellant's conviction was not a violent felony is of no moment; however, it should not go without notice that drug trafficking is an inherently dangerous occupation and prohibiting drug dealers from possessing firearms is equally consistent with the historical tradition of disarming dangerous persons." ***See*** Commonwealth's brief at 23.

For its part, the OAG in its *amicus* brief chiefly advocates that § 6105 is constitutional because it satisfies both the "why" and "how" of being historically rooted within our nation's history of firearm regulation. It highlights that the country has since the 1770s disarmed classes of people thought to pose a risk to others, and has used convictions of crimes to establish such classes. ***See*** *Amicus* brief at 8-22. In this vein, it states:

- 16 -

Thus, not only does [§] 6105(c)(2), as applied to drug traffickers like [Appellant], share a "why" with historical gun restrictions, but it also shares a "how" with them, and a less restrictive one at that. Like traditional gun restrictions imposed on vagabonds, outlaws, habitual criminals, and highwaymen, [§] 6105 identifies a category of persons deemed too dangerous to possess a weapon, and makes it a crime for such persons to do so. And as other early American laws, such as the sedition laws, [§] 6105 uses a criminal conviction as a proxy for dangerousness, predicating disarmament upon a conviction for a dangerous offense. Lastly, as applied to [Appellant], [§] 6105 is actually less restrictive than many traditional laws because it provides a way for [Appellant] to restore his right to bear arms. Section 6105 therefore achieves its history-based goal of reducing crime and gun violence, by burdening the right in a manner similar to how the right has been burdened for at least two and a half centuries.

*Id*. at 22. The OAG also notes that at least twenty-one different federal courts have "rejected as-applied challenges to laws prohibiting convicted drug traffickers from possessing firearms" in the past few years, including the Eighth Circuit in *Jackson*. *Id*. at 25-28.

Based upon our review of the jurisprudence, including the Supreme Court's most recent discussion in *Rahimi*, we conclude that the prohibition imposed on Appellant by § 6105 "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. As noted, the *Rahimi* Court stated that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. Here, the trial court specifically found that Appellant's prior convictions for PWID placed him in the category of persons who would pose a credible threat to others. This was supported by the Commonwealth's argument at the hearing. *See* N.T.

- 17 -

Hearing, 8/8/23, at 16 ("[D]rug trafficking is inherently a violent offense. It indicates a willingness on the part of the drug trafficker to defend his business by any means necessary, and most drug dealers do possess firearms.").

Our position is consistent with the U.S. Supreme Court's repeated admonition that *Heller* and its progeny "should [not] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Heller*, 554 U.S. at 626. Moreover, as numerous courts have recounted in their opinions, categories of people have historically been disarmed despite not having actually engaged in violent behavior. *See*, *e.g.*, *Jackson*, 110 F.4th at 1126-27 (discussing colonial regulations that prohibited certain classes of persons from owning firearms, such as those who fail to swear a loyalty oath); *see also Jenkins*, 328 A.3d at 1092 (highlighting firearms prohibitions relating to sureties and vagrants).

Furthermore, as we astutely observed in *Farmer*:

> From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others. The *Rahimi* Court cited surety laws, whereby a person suspected of future misbehavior, including misuse of firearms, was required to post a bond or face jailtime. Those who posted bonds would forfeit the bond in the event of future misbehavior. "Going armed" laws "prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify the good people of the land." Punishment included imprisonment and forfeiture of weaponry.

> Noteworthy here is the lesson the *Rahimi* Court drew from the surety and going armed laws. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." That is,

> [18 U.S.C.] § 922(g)(8) was sufficiently analogous to the going armed and surety laws in both its "how" – restricting gun possession – and its "why" – because the subject posed a credible threat of violence to another.

*Farmer*, 329 A.3d at 454 (cleaned up).

Hence, America's history of prohibiting certain classes of people from having firearms, particularly those that could pose a higher risk of danger to society, provides a "historical analogue" required by *Bruen* for § 6105, even if it is not a "historical twin." *See Bruen*, 597 U.S. at 30. Additionally, our holding aligns with the federal court cases cited by the OAG that have addressed this nearly identical issue and concluded that the dangerous combination of drugs and firearms permits the government's regulation. *See Amicus* brief at 25-28 (citing, by way of example, *Jackson*, *United States v. Birry*, 2024 WL 3540989 (M.D. Pa. 2024), and *United States v. Daniels*, 2024 WL 4906482 (E.D. Pa. 2024)).

In reaching this decision, we necessarily conclude that Appellant's arguments to the contrary are unpersuasive. Although he devotes a significant portion of his brief to describing that PWID is not a "crime of violence," that contention is unavailing since "crime of violence" is not the term utilized by the U.S. Supreme Court throughout its recent case law. Instead, the *Rahimi* Court highlighted that firearm prohibitions may apply to those that pose a "credible threat" to the safety of another. Drug traffickers fit that mold.

Next, although Appellant is correct that there is no identical provision from the founding era restricting drug traffickers from having firearms, likely

arising from the lack of existence of this crime in that era, that does not entitle him to relief. It is clear that "historical analogues" are close enough to show that § 6105 has a historically rooted "how" and "why" of restricting firearm possession. No "dead ringer" is required. *See Bruen*, 597 U.S. at 26.

Finally, as the OAG identifies, the ban imposed pursuant to § 6105 is not permanent because Pennsylvania law permits restoration of gun rights in certain circumstances. *See*, *e.g.*, 18 Pa.C.S. § 6105(d) (allowing for application to the court of common pleas for relief from the disability imposed by this section); *see also* 18 Pa.C.S. § 6105.1 (outlining procedure for restoration of firearms rights restricted by § 6105). Section 6105 is then, in that sense, less restrictive than some of the historical laws that permanently disarmed individuals without any conviction simply because they belonged to a certain class.

In short, Appellant's as-applied constitutional challenge fails, and no relief is due.[6]

_____

[6] Although not discussed by any of the parties, we are cognizant that a panel of this Court held to the contrary in a non-binding decision. *See Commonwealth v. Anderson*, 332 A.3d 1259, 2024 WL 5205507, *6 (Pa.Super. 2024) (non-precedential decision) (finding that the Commonwealth failed to meet its burden of showing a history or tradition of disarming those convicted of nonviolent drug offenses). *Anderson* is readily distinguishable because the panel specifically determined that the Commonwealth's principal brief, less than three pages in length, failed to cite *Rahimi* or the relevant authorities guiding this Court's review, instead relying solely on non-controlling case law, and that the prosecution wholly neglected to address the "how" and "why" analysis called for in *Bruen*. *See Anderson*, 2024 WL 5205507, *6.

## Facial Constitutional Challenge

In his second claim on appeal, Appellant raises a facial constitutional challenge to § 6105(a)(1), arguing generally that "the absence of founding-era laws that imposed a similarly broad punitive burden on Americans' Second Amendment rights" renders this section unconstitutional under **Bruen**. **See** Appellant's brief at 41-42.

The Supreme Court of the United States has recounted that a facial attack "is the most difficult challenge to mount successfully, because it requires a defendant to establish that **no set of circumstances exists under which the Act would be valid**." **Rahimi**, 602 U.S. at 693 (cleaned up, emphasis added). **See also U.S. v. Stevens**, 599 U.S. 460, 472 (2010) ("To succeed in a typical facial attack, [an appellant] would have to establish 'that no set of circumstances exists under which [the statute] would be valid,' . . . or that the statute lacks any 'plainly legitimate sweep.'"[7] (cleaned up)). Our High Court has recognized this same standard when addressing such facial constitutional challenges in other contexts. **See**, **e.g.**, **Commonwealth v.**

---

[7] The Pennsylvania Supreme Court explained:

> [U]nder the "plainly legitimate sweep" standard, a statute is only facially invalid when its invalid applications are so real and substantial that they outweigh the statute's "plainly legitimate sweep." Stated differently, a statute is facially invalid when its constitutional deficiency is so evident that proof of actual unconstitutional applications is unnecessary. For this reason (as well as others), facial challenges are generally disfavored.

**Clifton v. Allegheny County**, 969 A.2d 1197, 1223 n.37 (Pa. 2009) (citation omitted).

*Hunte*, ___ A.3d ___, 2025 WL 1703981, *8 (Pa. June 17, 2025) ("A statute is facially unconstitutional only where no set of circumstances exists under which the statute would be valid." (citation omitted)).

In *Rahimi*, the Court reiterated that in order for the government to prevail in defending against such a claim, it "need only demonstrate that [the statute] is constitutional in some of its applications." *Rahimi*, 602 U.S. at 693. In that vein, the Court rejected Rahimi's facial challenge, highlighting on two separate occasions that the criminal statute in question could be applied lawfully to Rahimi himself. *Id*. at 693, 700.

Following this logic, we deem that Appellant's claim of facial unconstitutionality likewise fails. Since we have already concluded that § 6105 is constitutional as applied to Appellant, his facial challenge cannot succeed because he has not demonstrated that "no set of circumstances exists under which the [statute] would be valid." *Id*. at 693; *see also Hunte*, 2025 WL 1703981, *8.[8] Nor has Appellant shown, or attempted to argue in his brief, that § 6105(a)(1) "lacks any plainly legitimate sweep." *Stevens*, 599 U.S. at 472. Appellant accordingly is not entitled to relief based on this position.

_____

[8] Although not binding on this Court, we note that this position is consistent with federal law. *See*, *e.g.*, *U.S. v. Decastro*, 682 F.3d 160, 163 (2nd Cir. 2012) ("It follows that a defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has necessarily failed to state a facial challenge, which requires him to establish that no set of circumstances exists under which the statute would be valid.") (cleaned up).

For the above reasons, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/31/2025